**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: ) | |
| ) | |
| **8760 SERVICE GROUP, LLC, and** ) | |
| **PELHAM PROPERTY, LLC,** ) | **Case No. 17-20454-drd-11** |
| ) | |
| **Debtors.** ) | |

## MEMORANDUM OPINION

This matter is before the Court on the Order Granting Joint Motion to Establish Administrative Procedures for Determination of Validity, Priority and Extent of Liens in Sales Proceeds. For all the reasons set forth below, the Court finds that Bancorpsouth Bank ("BCS") holds a first priority security interest in the non-office equipment and inventory of 8760 Service Group, LLC and a first priority security interest in the blast booth installed on the real property at 5105 Pelham Drive[1].

### I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Debtor 8760 Service Group, LLC ("8760"), operated a custom industrial construction and fabrication business with a business office located at 1803 W. Main Street, Sedalia, Missouri. Buck Barnes is the only member of 8760. Debtor Pelham Property, LLC ("Pelham") was formed to own the real estate located at 5105 Pelham Drive, Sedalia, Missouri, from which debtor 8760 operated a fabrication facility. Debtor 8760 is the only member of Pelham.

---

[1] The Court notes that there is not a separate motion or objection before the Court on which it can enter an order. Additionally, the parties have advised the Court that they have resolved the remaining three issues that were originally raised (marshaling, subrogation and diminution in value) and that are not dealt with in this opinion and have memorialized that resolution in a written document.

[2] The factual and procedural background of the case has been presented to the Court in both written joint stipulations and through testimony at trial.

BCS was the Debtors' primary lender. Pelham was the primary obligor on the loan from BCS to purchase the land and build the structure on Pelham Drive. 8760 was a guarantor on the loans and made all of the loan payments. BCS holds a deed of trust on the real estate at 5105 Pelham Drive (the "Real Property"). 8760 also entered into loans with BCS to fund its operations and entered into security agreements pledging as collateral its inventory, equipment and accounts receivable. In 2014, BCS filed a UCC-1 financing statement to perfect its lien which identifies the collateral as all of 8760's accounts receivable, inventory, and equipment located at 1534 Redwood Drive, Sedalia, Missouri, which was the home of Buck Barnes. In 2015, BCS filed a UCC-3 amending the description of collateral to include "all accounts receivable, inventory, equipment, and all business assets located at 1803 W. Main Street, Sedalia, Missouri." That address was the business office of 8760 and very little of its property was ever located there.

A blast booth was installed in the building located at 5105 Pelham Drive. It was paid for and installed with funds drawn on Pelham's construction loan with BCS. However, the contract to build the blast booth and the invoices for its construction were in the name of 8760.

In 2016, Hudson Insurance Company ("Hudson") provided payment and performance bonds to debtor 8760. To secure the bond, 8760 transferred an interest in and granted liens to Hudson in substantially all of its property. In 2017, Hudson filed a UCC-1 with respect to 8760's inventory, equipment and accounts.

## II. LEGAL ANALYSIS

### A. Collateral Description Issue

The parties are in dispute as to the validity, priority and extent of the liens on 8760's

2

equipment and inventory. The principal dispute is whether BCS or Hudson holds the first-priority lien position on certain of 8760's equipment and inventory. Debtors and Hudson contend that the collateral description in BCS's financing statement referenced a specific address location which restricted the collateral to that location. While BCS filed prior to Hudson, Debtors and Hudson contend that BCS is unperfected and thus unsecured due to the limitations contained in the financing statement[3].

BCS contends that the collateral description contained in the financing statement was sufficient to perfect its interest in all assets regardless of location because the collateral description was an unambiguous, blanket description with no location restriction and, that if there was any ambiguity in the collateral description it was sufficient to serve as a notice filing and trigger a duty to investigate further into the covered collateral.

BCS and debtor 8760 entered into certain promissory notes and security agreements in which 8760 granted BCS a security interest in all of its accounts and other rights to payments, inventory and equipment. In November 2014, BCS filed its initial UCC-1 financing statement listing 8760 as debtor and describing the collateral covered on page 1 as "All Accounts Receivable, Inventory and equipment, located at 1534 Redwood Drive, Sedalia, MO 65301."

In December 2015, BCS filed an amended financing statement in which the collateral was described as "All Accounts Receivable, Inventory, equipment and all business assets, located at 1803 W. Main Street, Sedalia, MO 65301." Page 2, section 14 further describes the collateral as "the above collateral, whether now owned or hereafter acquired, together with all supporting

---

[3] The parties also dispute which party has the burden of proof on both remaining issues. The Court agrees that the burden would shift depending on the legal or factual basis on which the Court relies, but has determined that this issue is irrelevant because its analysis remains the same on each issue and it would render the same decision in any event.

3

obligations, proceeds, products, software, accessories and accessions, including, but not limited to the items listed…."

BCS claims that its financing statements were not seriously misleading and triggered a duty to further investigate the extent of BCS's security interest. BCS relies on *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809 (8th Cir. 2009), an 8th Circuit case applying Missouri law, to support its position. In the *ProGrowth* case, the debtor and creditor entered into a promissory note and security agreement with two annuity contracts issued by Fidelity & Guaranty Life Insurance Company as security. The annuity contracts were identified as "L9E00015" and "L9E00016." The creditor filed a financing statement in which it identified the collateral as "All of Debtor's right, title and interest in and to, assets and rights of Debtor, wherever located and whether now owned or hereafter acquired or arising, and all proceeds and products in **that certain Annuity Contract No.: LE900015 issued by Lincoln Benefit Life…."** (Emphasis added). This description transposes the E and 9 in the contract number and identifies the issuer as Lincoln Benefit Life rather than Fidelity & Guaranty Life Insurance Company. An additional financing statement was filed with the same description for the other annuity contract identifying it as **"that certain Annuity Contract No.: L9E00016 issued by Lincoln Benefit Life…."** (Emphasis added). This contract number was described correctly but the issuer was incorrect.

Thereafter, the debtor obtained a loan from ProGrowth and assigned his interest in the same annuity contracts. ProGrowth filed two financing statements accurately describing the annuity contract numbers and issuer. ProGrowth then filed a lawsuit seeking a declaratory judgment that its perfected security interests in the annuity contracts were prior to and superior to any perfected security interests claimed by the defendants because the prior financing statements

4

were seriously misleading in transposing the contract numbers and misidentifying the issuer. The district court granted summary judgment in favor of ProGrowth and the defendants appealed.

On appeal, the 8th Circuit applied Missouri U.C.C. law to determine whether the defendants' security interests in the annuity contracts were perfected. Missouri Revised Statute § 400.9-502(a) provides, "a financing statement is sufficient only if it: (1) [p]rovides the name of the debtor; (2) [p]rovides the name of the secured party or a representative of the secured party; and (3) [i]ndicates the collateral covered by the financing statement." The relevant question there, as here, was whether the financing statement sufficiently indicated the collateral that it covered. A financing statement "sufficiently indicates the collateral that it covers if the financing statement provides: (1) a description of the collateral pursuant to section 400.9-108; or (2) an indication that the financing statement covers all assets or all personal property." Mo. Rev. Stat. § 400.9-504. The referenced section § 400.9-108 provides that a "description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." Additionally, a financing statement "substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." Mo. Rev. Stat. § 400.9-506(a).

The 8th Circuit noted that the U.C.C. requirements are intended to provide those dealing with commercial activities knowledge of the status of the commodity with which they are dealing and, to that end, the financing statement serves the purpose of putting subsequent creditors on notice the property is encumbered. *ProGrowth*, 558 F.3d at 812 (quoting *First Nat. Bank of Steeleville, N.A. v. Erb Equip. Co.*, 921 S.W.2d 57, 62 (Mo. Ct. App. 1996) and *Thorp Commercial Corp. v. Northgate Indus., Inc.*, 654 F.2d 1245, 1248 (8th Cir. 1981)). Thus, the

court stated that it views the validity of a financing statement in terms of whether "it provides notice that a person *may* have a security interest in the collateral claimed." *Id.* The U.C.C. recognizes further inquiry may be necessary and that therefore, errors or omissions in the description of the collateral do not render financing statements ineffective unless they are seriously misleading. *Id.* (citing Mo. Rev. Stat. § 400.9-506 (U.C.C. cmt. 2)).

So, what renders a financing statement's collateral description seriously misleading? In our case, Debtors and Hudson both urge the Court to find that BCS's description, because it includes an address, is seriously misleading. In *ProGrowth*, the court instructed that "when faced with a financing statement purporting to cover 'all assets' of a debtor, it is then incumbent upon the subsequent creditor to investigate whether the collateral at issue is in fact covered by a security agreement." *Id.* at 813. The court then concluded that the financing statements satisfied the provisions of the Missouri U.C.C. because they indicated coverage over all assets thus giving an indication that all of the debtor's assets may be covered and the inaccuracies were not seriously misleading. Additionally, and importantly, the 8th Circuit found that "[w]here a description can reasonably be interpreted in one of two ways- one of which may cover the collateral at issue and one of which does not- notice filing has served its purpose of alerting subsequent creditors to the possibility that a piece of collateral may be covered; the burden is then on the subsequent creditor to inquire further." *ProGrowth*, 558 F.3d at 814 (citing *Thorp*, 654 F.2d at 1252-53).

Additionally, the U.C.C. does not require a perfect collateral description, only an "indication" of such coverage. *Id.* While the specific descriptions of the annuity contracts in the *ProGrowth* financing statements contained errors, they were not seriously misleading because a subsequent creditor should have reasonably understood that all assets may be covered and it was

6

Case 17-20454-drd11 Doc 214 Filed 05/08/18 Entered 05/08/18 14:35:11 Desc
Main Document Page 7 of 16

then incumbent upon any subsequent creditors to inquire whether specific collateral was the subject of a prior security agreement. *Id.* at 15.

As noted, in December 2015, BCS filed an amended financing statement in which the collateral was described as "All Accounts Receivable, Inventory, equipment and all business assets, located at 1803 W. Main Street, Sedalia, MO 65301." BCS contends that its collateral description could reasonably be interpreted two ways: (1) that the address restricts all described collateral OR (2) that the commas and addition of the second "all" limits the address restrictor only to the business assets.

BCS also cites the Court to several cases that deal specifically with an address restrictor in a financing statement collateral description. In *First Bank v. Eastern Livestock Co.*, 837 F.Supp. 792, 796 (S.D. Miss. 1993), the collateral was described as "all cattle which [the debtor] owned or thereafter acquired which were kept on real estate owned by Bobby Caston and located on HWY 569 in Amite County." The question to the court was whether the description was seriously misleading to a subsequent creditor to the extent the creditor held a security interest in other cattle owned by the debtor. The court held that the description was not seriously misleading and that a reasonably prudent buyer would have been on notice that it should inquire as to the meaning of the language used in the description. Similarly, in *In re VML Co., LLC*, 2010 LEXIS 6554 (Bankr. W.D. Tenn. 2010), the collateral description in the financing statement included property located at two specific addresses but also included "all materials stored on the Property, goods, machinery, tools, equipment, furniture, supplies, raw materials, work in progress, inventory and motorized vehicles." The issue was whether the language limited the security interest to only the collateral found at the specific locations. The *VML* court determined that the address limiting

7

language was not seriously misleading and triggered a duty to inquire where the financing statement covered potentially moveable assets that were "now owned or hereafter acquired." A reasonable creditor would have notice that a prior lender had a security interest in personal property of the debtor and should then seek out the extent of the interest as memorialized in the security agreement. *Id.* The court in *In re Sterling United, Inc*., 519 B.R. 586 (Bankr. W.D.N.Y. 2014), held the same. At the trial Hudson argued that these cases were solely decided on the location of the collateral but this isn't accurate. As BCS pointed out, the *Sterling*, *VML*, and *Eastern Livestock* cases all relied on whether the financing statement collateral description was seriously misleading which is most relevant to the issue at hand.

Debtors and Hudson argue that BCS's financing statement is ineffective to put a subsequent creditor on notice to inquire further because it is plain and unambiguous as to the limited scope of the covered collateral. They assert that the financing statement did not indicate "all assets or property" so BCS was required to describe the covered property. They also argue that the financing statement was seriously misleading because it failed to reasonably identify collateral covered other than that located at 1803 W. Main Street.[4] Debtors and Hudson rely on *In re Freeman*, 33 B.R. 234 (Bankr. C.D. Cal. 1983), for the proposition that a financing statement that places an address restrictor on the covered collateral does not cover any other collateral because it fails to "reasonably identify" the collateral at another address. That court determined that the creditor did not have a security interest in property located at a subsequent address. However, as BCS points out, that case is distinguishable from the case at hand because both the

---

[4] Debtors and Hudson urge the Court to look only to the financing statement amendment filed by BCS in 2015 (the third UCC filing). The Court does not disagree that a later filed UCC-1 amendment is controlling over any previously filed statements, but it is not necessary for the Court to further analyze this argument because its finding would be the same under the collateral description in either financing statement in this case.

8

financing statement and the security agreement contained the address restrictor. The same distinction was present in *Matter of California Pump & Mfg Co., Inc.*, 588 F.2d 717 (9th Cir. 1978). That court only construed the security agreement language and did not deal with the perfection issue. Further, it was applying and interpreting the California U.C.C. regarding collateral description.

Hudson argues that *Lankford* supports its position because that court held the secured party only had priority on the property located at the address identified in the financing statement. However, that case was more focused on the fact that the debtor had relocated its business and whether there was an "after-acquired" collateral clause in the financing statement or security agreement[5].

The Court recognizes that these courts placed an emphasis on the address restrictor contained in the financing statement collateral description. However, the Court agrees with the reasoning of the *ProGrowth* court and finds that the cases cited by BCS are more applicable to this case than those cited by Debtors and Hudson. The collateral description in BCS's financing statement could "reasonably be interpreted in one of two ways- one of which may cover the collateral at issue and one of which does not," thus alerting Hudson that its collateral may already be perfected and putting the burden on Hudson to further inquire[6]. *See ProGrowth*, 558 F.3d at

---

[5] Hudson and Debtors also cite to *In re Softalk Pub. Co.*, 856 F.2d 1328 (9th Cir. 1988); *In re I.A. Durbin, Inc.*, 46 B.R. 595 (Bankr. S.D. Fla. 1985); and *In re Northern Beef Packers, L.P.*, 2014 WL 948470 (Bankr. D.S.D. 2014). However, none of these cases is particularly helpful here because none deals with an address restrictor in the collateral description.

[6] This reference to "interpretation" of the financing statement language refers to the subsequent creditor's interpretation, not to a court's interpretation. The Court need not employ contract or statutory interpretation principles because it is not interpreting the language per se, but determining whether the creditor should have been put on inquiry notice based on such language. The Court itself is not interpreting the actual contract language but merely looking at the language contained in the financing statement to determine if such language puts the

814. The "and" in the collateral description between "[a]ll Accounts Receivable, Inventory, equipment" *and* "all business assets, located at 1803 W. Main Street, Sedalia, MO 65301" could at least have given Hudson an indication that all assets were covered by a prior lien and cause it to inquire into the collateral description contained in the security agreement. Further, the additional collateral description on page 2 of the financing statement should also have caused Hudson to reasonably question whether the collateral was already covered by a financing statement and to have inquired further. As *ProGrowth* and its ilk concluded, when a collateral description contained in a financial statement could reasonably be interpreted to cover the collateral at issue, a reasonably prudent creditor should consider itself on notice that its collateral may have a prior lien attached and should inquire further into the extent of such prior lien. BCS points out, and the Court agrees,

Thus, BCS's collateral description in the financing statement was not seriously misleading and was sufficient to put Hudson on notice that it should inquire into the extent of BCS's lien. Because BCS indisputably filed prior to Hudson, it holds a first priority security interest in 8760's non-office equipment and inventory[7].

B.   Fixture Issue

Also at issue is the validity, priority and extent of the lien on the Blast Booth. The initial question is whether the Blast Booth was owned by 8760 or Pelham. Hudson argues that the Blast

---

subsequent creditor on inquiry notice. Principles of statutory construction are used when a court is interpreting a statute or contract that it has determined is ambiguous. In a case such as here and *ProGrowth*, if the collateral description is determined to be ambiguous or open to multiple interpretations, the court does not proceed to interpret the language but instead finds that the subsequent creditor should have been on notice to inquire further into the collateral.

[7] The parties have stipulated to the amount of BCS's claims. Doc. 189 at ¶ 28.

Booth was owned by 8760 because its employees used the booth to fulfill its construction contracts and 8760 did not reimburse Pelham for the use of the booth or accrue any type of intercompany receivable. Hudson also asserts that Pelham claimed no benefit from use of the Blast Booth; that the vendor proposal to sell the booth was made to 8760; the vendor invoiced 8760 for the purchase and installation of the Blast Booth; and the draw request forms for funding the Blast Booth indicate the project owner was 8760.

Hudson argues in its brief, as discussed above, that it has a first priority security interest in 8760's equipment. It also asserts that the Blast Booth is not a fixture and is ordinary equipment subject to its claimed priority security interest in 8760's equipment pursuant to its financing statements. However, as the Court held above, the description contained in BCS's financing statement was sufficient and BCS holds the first priority security interest in 8760's equipment. Accordingly, even if the Court agreed with Hudson that 8760 was the owner of the Blast Booth and that the Blast Booth should be characterized as equipment, it would still be BCS that holds the first priority security interest in that equipment as discussed and held above.

BCS argues in its briefs that Pelham owns the Blast Booth because the booth was purchased and installed with funds drawn on Pelham's line of credit and Debtors concede that Pelham owned the booth. It also contends that the Blast Booth is a fixture under Missouri law and BCS has a senior and first priority lien pursuant to the deed of trust it holds from Pelham. Thus, if the Court were to agree with BCS's position on ownership and characterization of the Blast Booth, BCS would still hold a first priority lien as to the Blast Booth.

As discussed, although either scenario set forth by the parties leads to Court to the conclusion that BCS holds a first priority lien on the Blast Booth, the Court makes its own

11

findings as to the ownership and characterization of the Blast Booth.

Under Missouri law, there are several ways to determine title to goods not governed by certificates of title. A person or entity that has dominion or control over a thing has ownership of the thing. *Olin Corp. v. Dir. of Revenue*, 945 S.W.2d 442, 444 (Mo. 1997); *State v. Patchen*, 652 S.W.2d 265, 267 (Mo. Ct. App. 1983). And absent any evidence of title to an item, the party in possession of the item is the presumed owner. *Westbay v. G. D. Milligan & Son*, 89 Mo. App. 294, 297 (1901).

Proving ownership of personal property–not covered by a certificate of title–under Missouri law requires "minimal evidence." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010). And a party may establish ownership by using "any competent evidence." *Id.* For example, title to goods can be implied from a bill of sale. *Olson v. Penrod*, 493 S.W.2d 673, 677 (Mo. Ct. App. 1973). In the alternative, ownership can be shown by oral evidence from an employee of a corporation as a "witness with knowledge" of the corporation's ownership of a good. *Southwestern Bell Tel. Co. v. Ahrens Contracting, Inc.*, 366 S.W.3d 602, 606–07 (Mo. Ct. App. 2012). Title to goods may also be attained merely by completion of performance under contract. Mo. Rev. Stat. § 400.2-401 (2017). Lastly, title to goods is obtained by the owner of real property when the item becomes a fixture on the real property. *Marsh v. Spradling*, 537 S.W.2d 402, 405 (Mo. 1976).

In *Marsh*, cabinets were installed in home by nailing them to the walls and floors. The court noted that if the cabinets were removed, there would be torn places in the walls and holes in the floors and it would have been difficult to remove them if plumbing and wiring had been installed. Thus, the court determined that it was the annexor's intent to make the cabinets a

12

permanent accession, as shown by his acts and conduct and the cabinets were fixtures. *Id.* 537 S.W.2d at 404. When that occurs, title to the property (the cabinets) passes to the owner of the real estate; accordingly, the court held that the cabinets became fixtures, that the title passed to the owner of the real estate when they were installed and that they had become real estate.

In a fixture analysis, to determine when an item "become[s] so related to particular real property that an interest in the item arises," the Missouri Supreme Court outlined three necessary elements: (1) annexation, (2) adaption, and (3) the intent of the annexor. *Marsh*, 537 S.W.2d at 404. All three elements are required in some degree for an item to become a fixture. *Wisdom v. Rollins*, 664 S.W.2d 37, 39 (Mo. Ct. App. 1984) (holding that each element must be present to some degree no matter how slight); *Sears, Roebuck & Co. v. Seven Palms Motor Inn, Inc.*, 530 S.W.2d 695, 696-97 (Mo. 1975). Adaptation and intent are more important in determining whether an item becomes a fixture. *Herron v. Barnard*, 390 S.W.3d 901, 913 (Mo. Ct. App. 2013). But intent is of paramount importance. *Id.* at 912. Missouri law defining each of these elements is discussed below.

    1. **Annexation**

An item is annexed when it is physically attached to the real property. *Herron*, at 912. Even if there is only a slight physical attachment the annexation element is met. *Id*. However, when an item can be detached with minimal damage the fact that it was attached does not support a finding that it became a fixture. *Freeman v. Barrs*, 237 S.W.3d 285, 289 (Mo. Ct. App. 2007).

    2. **Adaptation**

Adaptation means that the building was "designed or built with the view of having the particular item made an integral part of the building, or if the alleged fixture was necessary for the particular use to which the premises are devoted" then the item is adapted to the building. *Herron v. Barnard*, 390 S.W.3d 901, 912 (Mo. Ct. App. 2013). In other words, the item must be "peculiarly adapted to the real property." *Hoffman Mgmt. Corp. v. S.L.C. of N. Am., Inc.*, 800 S.W.2d 755, 764 (Mo. Ct. App. 1990). However, when an item is usable at other locations, it is not peculiarly adapted to the building. *Herron* at 912. Thus, ". . . unless there is something peculiar or unique about the item itself that requires only that particular item to be used in the space, the element of adaptation is not met." *Herron v. Barnard*, 390 S.W.3d 901, 912 (Mo. Ct. App. 2013).

### 3. Intent

The intent element is of paramount importance in a fixture analysis. *Herron* at 912; *Marsh v. Spradling*, 537 S.W.2d 402, 404 (Mo. 1976). The intent element examines the intent of the annexor to make the item a permanent part of the real property. *Marsh* at 404. Intent is determined at the time of annexation. *Herron*, at 912. A court is not bound by subsequent testimony regarding the annexor's intent, nor by the annexor's secret or undisclosed intent. *Freeman v. Barrs*, 237 S.W.3d 285, 289 (Mo. Ct. App. 2007); *Bastas v. McCurdy*, 266 S.W.2d 49 (Mo. Ct. App. 1954). The court can look to the acts and conduct of the annexor at the time of annexation to determine the intent. *Freeman*, at 289.

14

As Debtors' principal testified at trial, the Blast Booth was bolted into the concrete floor of the 5105 Pelham Drive building and the building was specifically designed to incorporate the Blast Booth by installing special trenches for augers in the concrete floor. He testified that if the Blast Booth was removed the trenches would have to be covered or filled with concrete and the bolts would have to be cut off flush with the floor and driven down into the concrete floor to repair the area where the Blast Booth was located. Further, he testified that when Debtors installed the Blast Booth in the building he did not intend for the Blast Booth to ever be removed. It is clear to the Court that the Blast Booth qualifies as a fixture under Missouri law. *See e.g., Marsh*, 537 S.W.2d at 405. Thus, title to the Blast Booth is held by the owner of the real estate, which is Pelham as owner of the 5105 Pelham Drive real estate.

Further, even if the Blast Booth for some reason was not considered a fixture, the Court believes that evidence weighs in favor of Pelham being the owner of the Blast Booth. Most importantly in the Court's view, the booth was paid for with funds on Pelham's line of credit with BCS. Although there was testimony that some invoices and draw requests listed 8760 as the owner, those documents were not prepared by either of the Debtors and do not establish ownership. 8760 was the general contractor on the project which could have been the reason its name was used on project documentation but this does not prove ownership. No evidence was offered identifying who placed the name on the document or why. Absent such evidence, this fact has little weight in the analysis. The fact that 8760 used the Blast Booth and did not pay for its use is also not controlling because 8760 was the operating company and this type of situation is not unusual between closely held companies. Missouri law requires only "minimal evidence" to establish ownership and "any competent evidence" is sufficient. *See Southwestern Bell*, 366

15

S.W.3d at 606.  Based on all of the evidence, the Court finds that Pelham is the owner of the Blast Booth and BCS holds a first-priority security interest by virtue of its deed of trust.

### III.    CONCLUSION

For all the reasons discussed above, the Court finds that BCS holds a first priority security interest in the non-office equipment and inventory of 8760 Service Group, LLC and a first priority security interest in the Blast Booth installed on the real property at 5105 Pelham Drive.

DATED:      May 8, 2018                        /s/ Dennis R. Dow

                                                HONORABLE DENNIS R. DOW
                                                UNITED STATES BANKRUPTCY JUDGE